UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Case No. 23-CR-00384 (TJK) |
| ADE SALIM LILLY, | : | |
| | : | |
| Defendant. | : | |

## UNITED STATES' MEMORANDUM IN AID OF SENTENCING

Based on the significant increase in threats against Members of Congress, and, more generally, against Federal officials, and the serious and urgent need for deterrence, the United States respectfully requests that the Court sentence the defendant, Ade Salim Lilly, to a meaningful term of imprisonment. A sentence at the high end of the applicable Sentencing Guidelines range of 18 months, is sufficient, but not greater than necessary, to achieve the goals of sentencing and to provide adequate deterrence against future criminal conduct.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Lilly is before this Court having pled guilty to one count of Interstate Communications with a Threat to Kidnap or Injure, in violation of 18 U.S.C. § 875(c) and one count of Repeated Telephone Calls in violation of 47 U.S.C. § 223(a)(1)(D). These offenses span the course of 19 months, from the period around February 1, 2022 until November 8, 2023, during which Mr. Lilly executed a campaign of pervasive harassing communications against members of Congress. The defendant's harassing and threatening communications included over 12,000 telephone calls to approximately 54 offices of Members of Congress across the country, both in district offices located in various U.S. States and to offices located in Washington, D.C.

In one of these calls, Mr. Lilly threatened to kill a staff member working for a Congressional representative. *See* ECF No. 18 at page 1 (Statement of Offense 5/30/24).

Of the calls to Congressional offices, more than 6,526 were made by Defendant Lilly to offices within the District of Columbia. Defendant Lilly made the calls to the District of Columbia while he was in the State of Maryland, and then while in the territory of Puerto Rico. *Id.* Notably, Mr. Lilly moved to Puerto Rico from Maryland during the time he was waging his harassment campaign against Congress. During this time, according to the Draft Presentence Investigation Report ("PSR") he was arrested in Howard County, Maryland for Telephone Misuse - Repeated Calls. ECF No. 22 at page 12 (PSR 7/30/24).  In addition, an arrest warrant was issued for his arrest for misdemeanor threats of mass violence for conduct occurring on February 3, 2023 in Prince George's County, MD and a warrant for his arrest was issued for telephone misuse in Anne Arundel County, MD for conduct occurring on May 31, 2023. *Id.* at 12-13.[1]  Despite being arrested for his conduct by Maryland authorities on February 3, 2023, the Defendant's harassment and threatening phone calls continued for months.

Defendant Lilly's calls to the Congressional offices within the District of Columbia were made to a (202) area code phone number and were answered by staff present in the District of Columbia. Upon answering, the Defendant would generally berate a staff member over a particular issue.  When staff members would inform Defendant Lilly they cannot assist him, he would become angry and use vulgar and harassing language towards the individual who answered the phone. *See* ECF No. 18 at page 2 (Statement of Offense 5/30/24).

---

[1] All three of these Maryland cases are being resolved through this plea agreement, whereby the Maryland State's Attorneys have agreed to place their cases in a *Stet* status, as part of the Defendant's guilty plea to the Federal felony charges in this case.

2

Based upon his harassing communications, Defendant Lilly was repeatedly asked by Congressional staff members to refrain from calling. Also, because Defendant Lilly was such a prolific caller and because the calls were so frequently harassing, staff would recognize his phone number and refrain from answering his phone number. Then, in order to avoid detection and to prevent Congressional staff from not answering his phone calls, Defendant Lilly used *67 to mask his phone number. This caused his phone number to not appear when the his calls would be made. *Id.* at 3. In this way, the Defendant could continue his harassing phone calls. Because Lilly's distinctive voice and because of his angry rhetoric towards staff members, staff would transfer him to the United States Capitol Police Threat Assessment section. Police officers of the United States Capitol Police informed Defendant Lilly on multiple occasions that his phone calls were unwanted, and due to a harassing nature, were prohibited by law. *Id.* Despite the repeated warnings to stop – and despite already being arrested for such behavior by Maryland authorities, only his arrest on federal charges in this case stopped the criminal conduct.

His phone calls were not only harassing; Defendant Lilly made at least one phone call that involved threats to kill or injure the person he called. On October 21, 2022, defendant Lilly called from the State of Maryland into a Congressional office in Washington D.C. An employee of a Member of Congress answered the phone. During this phone call, Defendant Lilly told the victim words to the effect of "I will kill you, I am going to run you over, I will kill you with a bomb or grenade." The victim took this statement as a serious expression of an intent to inflict bodily harm. Defendant Lilly should have reasonably foreseen that the statement he uttered would be taken as a threat by the individual to whom it was made. *Id.* at 4.

In addition to the threatening phone call above, in at least seven cases, once staff became aware that Defendant Lilly was targeting a particular Congressional office for telephone

3

harassment, staff at the office would cease answering their phone, knowing that Defendant Lilly was calling. In these cases, Defendant Lilly would repeatedly call the office, causing the phone to ring. For example, in a two-day period between February 27, 2023 and February 28, 2023, Defendant Lilly called the D.C. office of one Congressional representative over 500 times. *Id* at 3. In addition, between February 6, 2023 and February 27, 2023, Defendant Lilly made 200 phone calls to the Office of a Congressional Representative. These phone calls we made from the District of Puerto Rico to the District of Columbia. The 200 phone calls were repeated and when Defendant Lilly called the phone numbers, forcing them to repeatedly ring, he did so the intent to harass staff members at the called number. *Id.*

## DISCUSSION AND RECOMMENDATION

### I. Generally Applicable Legal Principles

Though the Sentencing Guidelines are advisory, *United States v. Booker* provides that sentencing courts "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that the Guidelines provide "the starting point and the initial benchmark" for sentencing. *Gall v. United States*, 590 U.S. 38, 49 (2007); *see also United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006) ("*Booker* has not changed how the Guidelines range is to be calculated."). Moreover, the Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007); *Dorcely*, 454 F.3d at 376 (noting that "a sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness").

To calculate a Guidelines sentence, a district court must first select the applicable offense guideline and then select the base offense level within that applicable offense guideline. *United States v. Flores*, 912 F.3d 613, 616 (D.C. Cir. 2019). As the D.C. Circuit has long held, this inquiry must include an evaluation of all relevant conduct that could affect the Guidelines calculation. As noted:

> In the post-*Booker* world, the court must calculate and consider the applicable Guidelines range but is not bound by it. Under the Guidelines, "the sentencing range for a particular offense is determined on the basis of all 'relevant conduct' in which the defendant was engaged and not just with regard to the conduct underlying the offense of conviction." *Witte v. United States*, 515 U.S. 389, 393 (1995) (citing U.S.S.G. § 1B1.3). Section 1B1.3 details the conduct the sentencing court may consider in determining the applicable Guidelines range and the commentary to that section states, "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." U.S.S.G. § 1B1.3, Commentary, Background

## II. Defendant's Sentencing Guidelines Calculation

### A. Defendant's Criminal History Category

The Government concurs with the United States Probation Offices' assessment of the Defendant's criminal history scores, as set forth in the Draft Presentence Investigation Report ("PSR"). ECF No. 22 at page 11. The total criminal history score is 0 placing the defendant in criminal history category I. *Id.*

### B. Total Offense Level

The Government also concurs with the United States Probation Offices' assessment of the Offense Level Computation set forth in the PSR. *Id.* at page 8-9. With the exception of the application of the Zero-Point Offender adjustment, the parties appear in agreement with the calculated guideline range.

With respect to Count 2, Interstate Communications with a Threat to Kidnap or Injure, 18 U.S.C. § 875(c), the guideline is found in U.S.S.G. §2A6.1. That section provides that an offense involving threatening or harassing communications has a base offense level of 12. With respect to the specific offense characteristics, the government has uncovered no evidence that Mr. Lilly planned or developed an intent to carry out the threat to kill the Congressional victim. The defendant's plea of guilt is to a single threat, there was no court protection order in this case, and the offense did not result in a substantial disruption to a governmental function – for example, his threat did not require the evacuation of a building or clean-up or decontamination procedure, and the threatening communication was not broadcast publicly. Further, the threat itself involved a single instance evidencing little or no deliberation.  Factually, it is apparent that once Mr. Lilly became angry with the Congressional staff member, he started yelling at him and threatening him out of rage and anger. As a result, the offense level is decreased by 4 levels. U.S.S.G. §2A6.1(b)(6)(A) and (B).  Six levels are added because the victim was a government officer and employee, and the threating communication was motivated by the victim's status as a government employee.  Thus, under U.S.S.G. §3A1.2(a) and (b), 6 levels are added. The adjusted offense level for Count 2 is level 14.

With respect to Count 7, Repeated Telephone Calls, 47 U.S.C. §223(a)(1)(D), the guideline is found in U.S.S.G. §2A6.1, applying a base offense level of 6. There are no specific offense levels or victim related adjustments that apply to this guideline.  Therefore, the adjusted offense level for Count 7 is 6 levels.

When applying the multiple count adjustment in U.S.S.G. §3D1.4(a), (b), and (c), the combined offense level is 15. The defendant is entitled for two points for his timely acceptance of responsibility under U.S.S.G. §3E1.1(a), decreasing his offense level to 13.

**C. Zero-Point Offender Adjustment**

The only dispute in the guidelines is whether the defendant is entitled to a Zero-Point Offender adjustment under U.S.S.G. §4C1.1(a)(3). The government contends he is not entitled to a reduction, because of the plain meaning of the guidelines provision applied to the unambiguous facts of the Statement of Offense the Defendant agreed to. U.S.S.G. §4C1.1 provides that multiple criteria are required to be eligible for the zero-point offender adjustment. Most relevant here is the provision in (a)(3) that says, "the defendant did not use violence or *credible threats of violence* in connection with the offense" (emphasis added).

With respect to the zero-point offender for credible threats of violence, cases from this district support the approach the government requests this Court apply. In *United States v. Williams*, another District Court judge analyzed a zero-point offender reduction in the context of a prosecution related to January 6, 2021. No. 21-618 (ABJ), 2024 U.S. Dist. LEXIS 50862 at *3 (D.D.C. Mar. 22, 2024). The Court in *Williams* noted several key points. First, the defense bears the burden of proof in seeking the zero-point offender sentencing reduction. *Id*. (citing *United States v. Keleta*, 552 F.3d 861, 866, (D.C. Cir. 2009)). Second, neither the Sentencing Guidelines nor the D.C. Circuit has provided guidance as to the meaning of a similar term, "threat to use violence," used in another section of the guidelines. *Id.* 3-4 (citing *United States v. Johnson*, 64 F.4th 1348, 1352, (D.C. Cir. 2023)). As a result, courts should look to the "plain meaning of the term at the time the provision was enacted." *Id.* at 4. See also *United States v. Tyng Jing Yang*, No. 23-100 (JDB), 2024 U.S. Dist. LEXIS 22938 at *10 (D.D.C. Feb. 9, 2024) (applying similar approach).

In both *Williams* and *Tyng Jing Yang*, other judges in this district applied the plain meeting of "credible threats of violence" when evaluating whether an offender is entitled to the

7

reduction for zero-point offender reduction. The Court in *Williams* cited to Black's Law Dictionary definition of "violence" as "the use of physical force, usually accompanied by fury, vehemence, or outrage; especially, physical force unlawfully exercised with the intent to harm." *Williams,* 2024 U.S. Dist. LEXIS 50862 at *4 (citing *Violence*, Black's Law Dictionary (11th ed. 2019) (cleaned up). A "credible" threat is one that "offer[s] reasonable grounds for being believed or trusted." *See Credible*, Merriam Webster, https://www.merriam-webster.com/dictionary/credible; see also *United States v. Bauer*, No. 21-3862-2 (TNM), 2024 WL 324234 at *3 (D.D.C. Jan. 29, 2024) ("A credible threat of violence is a believable expression of an intention to use physical force to inflict harm.") (cleaned up). All of this shows that when this Court analyzes whether Defendant Lilly's is entitled to a Zero-Point offender adjustment, the Court should look to whether Defendant Lilly expressed a believable expression of an intention to use physical force to inflict harm.

To find this, the Court simply needs to turn to the Statement of Offense. ECF No. 18 at page 2 (Statement of Offense 5/30/24). The defendant's conviction and guilty plea for Interstate Communications with a Threat to Kidnap or Injure in violation of 18 U.S.C. § 875(c) is *precisely* a "credible threat of violence." If it was not credible, if by example, Mr. Lilly made the communication in a clear jest, or if he had no reason to think that the victim would have not taken it seriously from the context of the phone call, then the defendant cannot be guilty of this offense. An element of the offense is that "The message contained a true threat to injure the person of another." *Id.* In this case the victim *did* take this statement as a serious expression of an intent to inflict bodily harm, as the Defendant agreed to in the Statement of Offense. *Id.* Defendant Lilly acknowledged in the statement of offense supporting the plea agreement that he "should have reasonably foreseen that the statement he uttered would be taken as threat by the

individual to whom it was made." *Id*. Claiming now that his threat was not "a credible threat of violence" belies the facts underpinning his guilty plea. There is no way to square the plain text of the sentencing guideline provision related to this matter with the facts the defendant plead guilty to, to allow this reduction to apply. Therefore, the government requests this Court not apply the zero-point offender reduction and find the offense level of 13. With a Criminal History Category I, this results in a sentencing guideline range of 12-18 months.

### III.     Sentencing Recommendation

When determining the appropriate sentence, the District Court should consider all the applicable factors set forth in 18 U.S.C. § 3553(a). *See United States v. Gall*, 552 U.S. 38, 49-50 (2007). The listed factors in 18 U.S.C. § 3553(a) include: (1) the nature and circumstances of the offense; (2) The history and characteristics of the defendant; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The defendant's choice to threaten violence and engage in a pervasive harassment campaign against elected officials of the U.S. Government and their staffs, demonstrates a lack of self-control and a lack of respect, not just for the individual lawmakers or victims of his offense, but for the rule of law more generally. Especially considering the repeated warnings by the Capitol Police and the pleading of staff members to refrain from repeated calling, Defendant Lilly showed a complete disregard for others and thought nothing of the harm that comes from

threatening communications.

The fact that he did not plan to carry out this threat, is not mitigating to the offense of conviction. As noted in this district, speakers need not actually intend to carry out the threat to make it a criminal action. *United States v. Syring*, 522 F. Supp. 2d 125, 129 (D.D.C. 2007) ("The prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." (citing *Virginia v. Black*, 538 U.S. 358, 360 (2003)). When a person is threatened and their safety is challenged, the harm is complete.

The defendant's criminal conduct in this case, and the nature of his offenses, are especially serious. With threats against elected officials increasing, it is particularly crucial that the sentence imposed "reflect[s] the seriousness of" the offenses and "afford[s] adequate deterrence to criminal conduct." 18 U.S.C. § 3552(a)(2)(A), (B).

In order to properly evaluate the need for both specific and general deterrence, it is important to consider the larger context in which the defendant committed his harassing phone calls and his offensive threat. Threats against Members of Congress are on the rise. In the months following the defendant's threatening communications and during his harassment campaign, the Chief of the U.S. Capitol Police, J. Thomas Manger, testified before Congress and warned of the strain on the personnel and resources of the Department resulting from the increase in threats:

> The sheer increase in the number of threats against Members of Congress—approximately 400% over the past 6 years—requires new and innovative techniques to identify, deter, and mitigate threats before they materialize. Over the course of the last year, the world has continuously changed, becoming more violent and uncertain. A Member of Congress was brutally assaulted, another Member was attacked on the campaign trail, and the husband of the former House Speaker was critically wounded in a politically-motivated attack.[2]

---

[2] Oversight of the United States Capitol Police: Hearing before U.S. House of Rep. Comm. on House Admin., 118 Cong. (Mar 16, 2023) (Formal Statement of J. Thomas Manger Chief, U.S.

10

This is an election year, and more and more often, criticism of a political position or viewpoint crosses the First Amendment line and leads to true threats of violence. The pervasive rise in threats against elected officials creates a real risk that expressions of violence will become normalized. The new threat landscape has caused public officials to change the way they perform their duties, and the increase in threats has shown to have an impact on individuals' willingness to perform public service.[3] The defendant's threat against a staff member of an elected official is a striking example of disrespect and contempt toward legislative authority and requires an appropriate sanction as punishment, not only to protect the public figures who run for election, but also for the private figures who are employees of the institution. The Defendant's threat to kill the staff member of a Congressional Representative, by telling him "I will kill you, I am going to run you over, I will kill you with a bomb or grenade" simply because that employee answered the phone as part of his constituent services is a clear example of how this crime so significantly impacts the rule of law and why a sentence at the high end of the guidelines range is so essential for general and specific deterrence in this case.

In addition to the term of incarceration, the government requests the Court impose specific provisions in the defendant's term of supervised release. By statute, a district court may impose conditions of supervised release (other than certain mandatory ones) if the conditions are reasonably related to factors set forth in 18 U.S.C. § 3553 and involve no greater deprivation of liberty than is reasonably necessary for the purposes identified in that section. 18 U.S.C. §

---

Capitol Police). Available at https://www.congress.gov/118/meeting/house/115649/witnesses/HHRG-118-HA00-Wstate-MangerJ-20230516.pdf (last accessed August 20, 2024).

[3] See, 'We'll See You at Your House': How Fear and Menace are Transforming Politics, Danny Hakim, Ken Bensinger, and Eileen Sullivan, NEW YORK TIMES, May 19, 2024, available at: https://www.nytimes.com/2024/05/19/us/politics/political-violence.html (last accessed August 20, 2024).

3583(d) (1) and (2). The Sentencing Guidelines has restated those purposes by providing that the conditions must be reasonably related to (A) the nature and circumstances of the offense and the history and characteristics of the defendant; (B) the need for the sentence imposed to afford adequate deterrence to criminal conduct; (C) the need to protect the public from further crimes of the defendant; and (D) the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. U.S.S.G. § 5D1.3(b). In this case, given the facts underlying the defendant's conviction, the government requests the following special conditions be imposed, in addition to the standard conditions of supervised release:

- A condition that the Defendant does not contact, by telephone or electronic communication such as email or through social media, any members of Congress of staff members of Congress, other than those representatives representing the district in which he resides.

- A condition that the Defendant does not contact the business Bus Boys and Poets in Hyattsville, MD by any means including in person visits, voice, or electronic communication, or through any intermediaries.

- A condition that the Defendant does not contact Maryland Chair of the Health and Government Operations (HGO) Committee or any staff of the HGO Committee in their professional or private capacities by any means including in person visits, voice, or electronic communication, or through any intermediaries.

- A condition that the Defendant does not contact the Maryland Speaker of the House of Delegates or any staff of the Speaker in their professional or private capacities by any means including in person visits, voice, or electronic communication, or through any intermediaries.

- A condition that the Defendant does not contact the 9-1-1 emergency services in Howard Country, Maryland, or any other Maryland public safety emergency number, unless the defendant has a bona fide emergency requiring governmental assistance.

The Government contends these special conditions are necessary to protect the public and victims in this case from any further harassing communications.

## CONCLUSION

For all these reasons, the Government recommends that the Court sentence the Defendant to eighteen (18) months of incarceration to be followed by three (3) years of supervised release.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By: */s/ Alexander R. Schneider*
Alexander R. Schneider
Michigan Bar No. P71467
Special Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
alexander.schneider@usdoj.gov
(202) 252-7124